**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(SOUTHERN DIVISION)

| | |
|---|---|
| **SHARNEE SMITH, *et al*.,** | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *   Civil Action No. PX-22-00984 |
| | * |
| **SODEXO, INC., *et al*.,** | * |
| | * |
| Defendants. | * |
| | * |
| | ******* |

## REPORT AND RECOMMENDATIONS

This "Report and Recommendations" addresses "Smith's Unopposed Motion to Approve Settlement Agreement," filed by the Plaintiff Sharnee Smith in this purported collective action involving the Fair Labor Standards Act. (ECF No. 34).

Pursuant to 28 U.S.C. § 636, and Local Rule 301, the Honorable Paula Xinis referred this matter to me to author a report and to make recommendations. (ECF No. 35). The relevant issues have been briefed, and the undersigned now rules. *See* Local Rule 105. 6 (D. Md. 2023).

For the reasons set forth below, I ultimately recommend that the unopposed motion be denied without prejudice.

### I. PROCEDURAL BACKGROUND

On April 22, 2022, Plaintiff Sharnee Smith ("Plaintiff Smith"), individually and on behalf of "all others similarly situated" nationwide, filed a Collective Action Complaint against Sodexo, Inc., Sodexo Management, Inc., and Sodexo Operations, LLC (collectively, "the Defendants" or "Sodexo") alleging that they violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* (ECF No. 1, "Complaint" or "FLSA Collective Action"). The Collective Action contains one federal cause of action, styled "Overtime Violations of the FLSA." (Complaint, p. 11).

According to the Complaint, on or about December 11, 2021, there was a cyberattack to Kronos Private Cloud ("Kronos Outage"), a time-keeping and payroll software system used by the Defendants to track the hours worked by their hourly and salaried employees.  Unable to access Kronos after the breach, the Defendants failed to accurately track the hours that Plaintiff Smith and others worked from on or about December 11, 2021 until in or about March 2022.  Instead, the Defendants opted to estimate the number of hours worked and pay the workers based on prior pay periods.  As a result, Plaintiff Smith and others who worked more than 40 hours/week-- and who were not exempt from overtime under federal and state laws-- were not fully paid for all hours worked (overtime and regular[1]), nor were they paid the correct overtime premium rates due under federal law.  (Complaint ¶¶ 2-6, 14-17, 58-66, 72, 74, 78-80).  Relatedly, then, Plaintiff Smith and other workers were not timely paid for true overtime hours worked.  (Complaint ¶¶ 87-88).

The Complaint also alleges that if Sodexo did pay Plaintiff Smith and others for some of the overtime hours that they worked, the payments "did not take into account shift differentials and non-discretionary bonuses," which resulted in compensation not based on actual payrates and true hours worked(including overtime).  (Complaint ¶¶ 3, 9, 67, 73, 81, 83).

Appended to the Complaint is a document called "Consent to Join Wage Claim," signed by Plaintiff Smith, in which she consents to join the instant FLSA Collective Action on April 22, 2022.  (ECF No. 1-1).  Thereafter, eight additional plaintiffs opted in to the FLSA Collective Action.  (ECF Nos. 3, 8, 11, 17, 18, 25).[2]  To date, no other plaintiffs have opted in to the FLSA Collective Action.

---

[1] "Non-overtime," or regular wages, are mentioned in ¶¶ 3, 9, 64.
[2] Their names are: Crystal Hilderbrand, Theopolis Williams, Courtney Beasley, Carlos Williams, Sharon Webb, Angelia McLeroy, Melissa Wright, and Johntevia Mack.

On May 17, 2022, the Defendants filed a consent motion seeking an extension of time to file an Answer, which was granted.  (ECF Nos. 12, 13).  Thereafter, during the next seven months of 2022, four additional motions for extension of time for the Defendants to file an Answer were filed, all of which were granted.  (ECF Nos. 15, 16, 19, 20, 26, 27, 28, 29).  The majority of the extensions were sought to enable the parties time to engage in mediation.  (*Id.*).  The last order from the court required Defendants to file an Answer by February 24, 2023.  (ECF No. 29).

On February 10, 2023, the parties filed a joint status report, in which they set forth that they were still engaged in mediation in an attempt to resolve the case.  (ECF No. 30).  On February 24, 2023, the parties filed another status report.  According to the parties, two mediation sessions occurred, but ended without resolution of this case.  However, ultimately, the parties accepted the mediator's proposal to resolve this case.  (ECF No. 31).  The parties sought sixty days in which to prepare and file a joint in motion of court approval of the settlement agreement.  (*Id.*).

Thereafter, Plaintiff Smith submitted the unopposed motion and a memorandum of law related thereto (collectively "the Motion").  (ECF Nos. 34, 34-1).  Attached to the Motion are the following documents: (a) the "Settlement Agreement and Release" (ECF No. 34-2, pp. 1-15);[3] (b) a "Notice of Settlement of Wage Claims for Employees of Sodexo Related to Kronos Outage" (Exhibit A, ECF No. 34-2, pp. 16-19; hereinafter "Notice of Settlement"); (c) a document called "Formula For Distribution of Settlement" (Exhibit B, ECF No. 34-2, pp. 21-22; hereinafter "Formula"); (d) a document called "Settlement Check Language" (Exhibit C, ECF No. 34-2, p. 23); (e) "Declaration of Matthew S. Parmet," his curriculum vitae, and "Selected Settlements and Attorneys' Fees Awards" (ECF No. 34-3); and (f) "Declaration of Andrew R. Frisch in Support of Unopposed Motion for Approval."  (ECF No. 34-4).

---

[3] For simplicity's sake, the undersigned refers to the CM/ECF page numbers at the top of each pleading to which I refer.

The undersigned has reviewed all of the aforementioned documents.

## II. DISCUSSION

### A.  FLSA Collective Action

The FLSA establishes "minimum wage and overtime compensation for each hour worked in excess of 40 hours each workweek."  *Perez v. Mortgage Bankers Ass'n*, 572 U.S. 92, 97 (2015)(citation omitted).  In general, if an employee works more than 40 hours in a week, an employer must compensate that employee "at a rate not less than one and one-half times the regular what at which he is employed."  29 U.S.C. § 207(a)(1).

Plaintiff Smith advances this action on behalf of herself and others ("the Collective") pursuant to 29 U.S.C. § 216(b), which provides, in pertinent part:

> An action. . . may be maintained against any employer. . .in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

### B.  The Motion

Plaintiff Smith represents that she and the Defendants have agreed to resolve this case for the amount of $3,100,000.  (Motion, p. 12).  In the Motion, Plaintiff Smith asks the court to concurrently: (a) approve of the settlement; (b) certify three groups of possible plaintiffs as part of an FLSA collective; (c) authorize and facilitate the proposed notice to the potential collective members; (d) find that the negotiation of a settlement checks by a putative collective member constitutes an appropriate form of written consent to opt in to the FLSA collective; (e) name counsel for Plaintiff Smith as Collective Action counsel; and (f) award attorney's fees and costs. (Motion, pp. 7, 12-14, 22-25, 28).  The parties also ask the court to dismiss the Collective Action

Complaint with prejudice.  (Motion, p. 7).

This Report and Recommendations principally addresses those facets of the Motion that lead the undersigned to recommend that the Motion be denied.

### C.  The Settlement Agreement

The "Settlement Agreement  and Release" spans 14 pages and has 29 paragraphs, some of which have sub-parts.  (ECF No. 34-2, "Settlement Agreement").  As set forth below, this Report and Recommendations only focuses on those sections of the Settlement Agreement and exhibits that ultimately led the undersigned to recommend that the district court deny the Motion.

### 1.  *Designation of  Plaintiff Smith as Named Plaintiff and Collective Representative*

Per the Settlement Agreement, the parties intend for the court to designate Plaintiff Smith as the Named Plaintiff and Collective Representative.  (Settlement Agreement ¶ 5a.iii).  The parties also intend for the court to approve of an additional payment to her, which is identified as a "general release payment."  (Settlement Agreement ¶ 11).  Plaintiff Smith agrees not to seek a general release payment in an amount that exceeds $5,000.  (*Id.*).  The parties intend this general release payment to be in addition to any payment that Plaintiff Smith would receive due to being a member of one or more of the three Collective Action subgroups explained in the Settlement Agreement.  (*Id.*).

The general release payment is tied to the fact that Smith  is also separately releasing the Defendants from liability for other causes of action (including "any and all wage and hours claims" and discrimination claims)(Settlement Agreement ¶ 3.c.).

### 2.  *Collective Action Certification, Approval of Settlement and Continuing Jurisdiction*

The parties stipulate to the certification of the Collective by the court "for settlement purposes only."  (Settlement Agreement ¶ 5a.i).  The parties intend for the court to simultaneously

approve of the settlement and certify the Collective, resulting in a dismissal with prejudice of the instant lawsuit. (Settlement Agreement ¶¶ 4b., 4d.). [4] Relatedly, the parties intend for the court to approve of their proposed Notice of Settlement as part of its Collective-certification analysis. (Settlement Agreement ¶ 5c.). Finally, the parties intend for the court to have continuing jurisdiction to "construe, interpret and enforce the provisions of this Agreement and to supervise the administration and distribution of the resulting settlement funds." (Settlement Agreement ¶ 26).

### 3. Settlement Administrator

The Settlement Agreement provides for the use of a settlement administrator ("Administrator") in charge of managing or overseeing the collective (or common) fund process. That person/entity is not identified; the parties will mutually agree who the Administrator shall be. (Settlement Agreement ¶ 1.f).

The Administrator's tasks include:

> (i) mailing notice, settlement checks, and applicable tax forms to [the putative Collective members]; (ii) notifying the *Parties* of the FLSA Collective Members who join this settlement; and (iii) calculating individual settlement awards, including any appropriate withholdings.

(*Id.*) (emphasis supplied). The Settlement Agreement also provides details on how the Administrator is to carry out this process during an administration period. (Settlement Agreement ¶¶ 8a.-8g.). The Settlement Agreement mentions that the Administrator will be paid for the costs and fees incurred in administering the settlement, yet is devoid of any information related to those fees and costs. (Settlement Agreement ¶¶ 1g., 1h., 8f.).

---

[4] The docket sheet for this case confirms that there have been no prior efforts by the parties to have the district court conditionally certify the Collective to facilitate notice to a group of putative plaintiffs.

At the end of the administration period, the Administrator is to provide a full accounting to the parties' counsel of: (a) the names of the parties who have negotiated their settlement checks; (b) the total amount of those cashed/deposited checks; (c) the total amount of the monies remaining that were not distrusted to the members of the Collective; and (d) the total administration costs. (Settlement Agreement ¶¶ 8h.i -8h.iv).

Finally, the Settlement Agreement makes clear that the Administrator is to deduct the costs for administering the settlement fund-amongst other costs-**before** monies are to be available for distribution to the Collective.  (Settlement Agreement ¶ 1.h).

### 4.  The Settlement Collective: Three Subgroups

The Settlement Agreement first describes two groups: the Putative FLSA Collective and the FLSA Collective.  The members of the Putative FLSA Collective are described as:

> All non-exempt employees, regardless of exact job, position held, or title, employed by Sodexo in the United States from December 6, 2021 to March 12, 2022, who (i) were employed in a job position that used (or would have used but for the Kronos Outage), Kronos Private Cloud to track their hours worked, and (ii) who fall within one or more of the Collective Groups set forth [later in the Agreement]. . . .

(Agreement, p. 2, ¶ 1.a).

The FLSA Collective is described as:

> those Putative FLSA Collective members who have participated in [the] settlement by timely cashing, depositing, or otherwise negotiating their Settlement Check (sic).

(Agreement, p. 2, ¶ 1.b).

The Agreement further provides that three subgroups comprise the Putative FLSA Collective and the FLSA Collective, which "have been determined based upon the complete pay and time period at issue, as a result of the allegations at issue in [the lawsuit]" (Settlement

Agreement, p. 3, ¶ 1.i).  These subgroups ("Collective Groups") are: (a) "Net-Under Collective Group;" (b) "Net-Under Previously Paid Collective Group;" and (c) "Non-Exempt Protected States Collective Group."  The Agreement defines the Collective Groups as follows:

> **Net-Under**: Putative FLSA Collective and FLSA Collective members who were potentially underpaid during the Kronos Outage and remain underpaid. This group encompasses approximately 2,632 employees (*some of whom may also fall within one or both of the other Collective Groups set forth [in the Agreement]*).
>
> **Net-Under Previously Paid**: Putative FLSA Collective and FLSA Collective members who were potentially underpaid during the Kronos Outage and previously paid such underpayment by [Sodexo]. This group encompasses approximately 17,459 employees (*some of whom may also fall within one or both of the other Collective Groups set forth [in the Agreement]*).
>
> **Non-Exempt Protected States**: Putative FLSA Collective and FLSA Collective members who during the Kronos Outage worked in the following states:  AZ, CA, CT, IL, IN, MA, MD, ME, NJ, NM, NY, OH, VA, WA. This group encompasses approximately 25,673 employees (*some of whom may also fall within one or both of the other Collective Groups set forth [in the Agreement]*).

(Settlement Agreement ¶¶ 1.i.i through 1.i.iii) (emphasis supplied).

Next, according to the Agreement, "the total number of unique employees in the Putative FLSA Collective (inclusive of all Collective Groups) is approximately 45,507." (Settlement Agreement ¶ 1.i). [5]

### 5. *Notice of Settlement*

The Notice of Settlement purports to notify putative collective members why they are being contacted and of their "rights and obligations" regarding the settlement.  The Notice has nine sections.

---

[5] Per the Settlement Agreement, the total number of employees identified in the Net-Under, Net-Under Previously Paid, and Non-Exempt Protected States groups equals 45,507 or 45,764.  *Compare* ECF No. 34-2, p. 3 to ECF No. 34-2, p. 4.

If the court approves of the Settlement Agreement, a Notice of Settlement would be sent to each putative member of the Collective.  (Notice of Settlement, p. 17).  The top of the Notice of Settlement, and Section 6 therein, represent that the notice is "court-authorized," or "approved" of by the court.  (*Id.*, pp. 17, 19).  The Notice also tells the recipient not to contact the court.  (*Id.*, p. 19).

Section 1 notifies the recipients that there was an FLSA lawsuit filed in this District related to the Kronos Outage, and generally describes the alleged wrongdoing committed by "Sodexo"[6] related to "certain non-exempt employees" between December 2021-March 2022.  (*Id.*, p. 17).  It also says that a settlement has been reached without a finding that the Defendants were liable. Section 2 further notifies the recipients that they are receiving the notice because they were non-exempt employees of Sodexo during the relevant time period, and tells the recipients that they must have been classified as: a "Net-Under" (potentially underpaid) employee; a "Net-Under Previously Paid" employee (potentially not paid "on time"); and/or a "Non-Exempt Protected States" employee, who worked in one of 14 states (which are listed).  (*Id.*).  Beyond that brief description, these terms are not explained.  Section 2 also tells the recipients that they can "join the settlement by cashing, depositing, or otherwise negotiating the enclosed check," and that if they do not "join the settlement," they will not receive any money.

Section 3 explains that, ostensibly, some Sodexo employees were underpaid, others were overpaid, and others were not timely paid.  It further states that each putative plaintiff has been classified as belonging to one or more subgroups.  (*Id.*, p. 18).

If a recipient is a "Net-Under" employee, she will receive one check "representing [50%] wages and [50%] 'liquidated damages,'" which is further represented as being a "proportional

---

[6] It does not identify the three Sodexo entities implicated. (*Id.*).

amount" of delayed wages and " will be a minimum of $30.00." (*Id.*). If a recipient is a "Net-Under Previously Paid" employee, she will receive one check "representing 'liquidated damages,'" which is further represented as being a "proportional amount" of delayed wages, and "will be a minimum of $30.00." (*Id.*).

If a recipient is a "Non-Exempt Protected States" employee, she will receive one check "representing potential state law penalties for working in certain states for Sodexo." (*Id.*). The payment is further described as being "divided on a per-person basis based on the total number of individuals in this group and based on the amount in the settlement fund."[7] (*Id.*). Finally, Section 3 states that if a putative plaintiff falls in or more of the three subgroups, she "will receive one check representing payment for all of the categories above into which [she] falls." (*Id.*).

Section 4 explains that a putative plaintiff can receive a settlement payment if he "cash[es], deposit[s], or otherwise negotiate[s]" the check sent to him. (*Id.*). If the putative plaintiff does not want to participate in the settlement, he should not cash/deposit/negotiate the check. (*Id.*). In such a circumstance, the employee will not forego any rights to independently pursue claims against the Defendants, yet it also signifies that if he were overpaid by the Defendants, he might have to repay that money to Sodexo. (*Id.*).

Section 5 notifies a putative collective member that she acknowledges that she: (1) joins the settlement by cashing, depositing of negotiating the settlement check; (2) consents to being represented by Plaintiff Smith's counsel (referred to as "Collective Attorneys"); (3) is bound by an attorney-client agreement that Plaintiff Smith signed; and (4) is bound by the Settlement Agreement. It further advises the putative collective member that she does not have to pay the

---

[7] The Motion states that each member of this group will receive $50.00. (Motion, p. 11). However, Exhibit B does not mention $50.00. (ECF No. 34-2, p. 22). Next, Exhibit B says that the available monies will be allocated on a "per rata person basis." (*Id.*).

Collective Attorneys' legal fees or cost, which will be paid by Sodexo "as part of the settlement as a percentage of the overall recovery." (*Id.*). Next, it advises the person who cashes the check that she waives and releases "all wage and hour claims against Sodexo related to the Kronos Outage," including those for "unpaid wages, late payment of wages, and overtime and penalties under federal, state, and local law," for the period of December 1, 2021 until the date that the court approves of the settlement." (*Id.*, p. 19).

Section 7 explains that Sodexo denies any wrongdoing and does not concur that an FLSA collective action lawsuit against it is appropriate. (*Id.*, p. 19). However, Sodexo agrees that the settlement is a fair resolution of the legal dispute, and that Sodexo will not take any adverse employment action against an employee if she joins or declines to join the Collective Action. (*Id.*).

Section 8 advises putative plaintiffs that they have 90 days from the date that a settlement check is issued to cash or otherwise negotiate the settlement check. (*Id.*). It also explains how a putative plaintiff can get a replacement check, should the initial instrument be damaged or lost. (*Id.*).

Section 9 tells the recipient that the Notice of Settlement "is only a summary," and if he has additional questions, he can contact the Settlement Administrator. (*Id.*). There is no one identified as the Settlement Administrator in the Notice of Settlement; there is, however, a placeholder for that person's contact information. (*Id.*).

      *6. Settlement Awards*

According to the Settlement Agreement, the parties have agreed to resolve this case for the amount of $3,100,000 ("Gross Settlement Amount") (Settlement Agreement ¶ 1.g). From the Gross Settlement Amount, the following will be paid: (a) awards to members of the three Collective Groups; (b) the Collective Groups members' "share of applicable federal, state, and

local taxes required to be withheld by Sodexo;" (c) separately to Plaintiff Smith an additional general release payment; (d) all attorney's fees and costs and other litigation expenses; and (e) all of the Administrator's fees and costs incurred in administering the settlement fund. (*Id.*).

Neither the Settlement Agreement nor the attachments related thereto contain specific dollar amounts for attorneys' fees and costs, nor do they delineate the Administrator's fees and costs.

Regarding payments to the members of the Collective, the Formula for deciding the award amounts varies depending upon which group(s) apply to a putative plaintiff.[8]

For the members of the Net-Under group, an estimated amount of $518,419 is purportedly available for distribution to 2,632 putative plaintiffs, with each member's share to be allocated on a pro-rata basis; except that if a member's pro-rata share results in a potential payment of less than $30.00, then the member will receive a minimum of $30.00. (Settlement Agreement ¶ 1i.i.; Formula ¶ 1). For members of the Net-Under Previously Paid group, an estimated amount of $1,297,931 is purportedly available for distribution to 17,549 putative plaintiffs, with each member's share to be allocated on a pro-rata basis; except that if a member's pro-rata share results in a potential payment of less than $30.00, then the member will receive a minimum of $30.00. (Settlement Agreement ¶ 1i.ii.; Formula ¶ 2). For members of the Non-Exempt Protected States group, an estimated amount of $1,283,650 is purportedly available for distribution to 25,673 putative plaintiffs, with each member's share to be allocated on a "per rata person basis." (Settlement Agreement ¶ 1i.iii.; Formula ¶ 3).[9] There is *no minimum distribution* amount listed

---

[8] As set forth later, the descriptions of the how the formulas are to be used a bit confusing.
[9] The Motion provides more detail: (a) Net-Under Collective Group: will receive "100% of the wages remaining unpaid ($288,011) and 80% of alleged liquidated damages (prior to deductions for court approved attorney's fees and costs, settlement expenses and fees, general release payment);" (b) Net-Under Previously Paid Collective Group: will receive "74% of the alleged underpayment of $1,749,948 as liquidated damages. . .which totals $1,297,931 (prior to deductions for court approved attorney's fees and costs, settlement expenses and fees, general release payment);" and (c) Non-Exempt Protected States Collective Group: each of the 25,673 employees that constitute this group will

for Non-Exempt Protected States Group. (Formula ¶ 3).

Next, only **after** the Administrator deducts: (a) the costs for administering the settlement fund;(b) the general release payment; and (c) the attorney's fees and costs, will the remainder be available for distribution to the Collective Groups. (Settlement Agreement ¶ 1.h).  This is the money actually available for disbursement, which is called "the Collective Settlement Amount." (Settlement Agreement ¶ 1.h).

       *7. Tax Treatment: Settlement Payments*

The parties intend that the settlement awards disbursed to the Collective be reduced for "applicable federal, state, and local taxes required to be withheld by Sodexo." (Settlement Agreement, p. 3, ¶ 1.g)

In addition, the parties intend different tax treatment depending upon which of the three Collective subgroups is being considered.  For the Net-Under group, the payment will be divided 50% as wages and 50% as liquidated damages under the FLSA, with an IRS Form W-2 for the wage portion "and an IRS Form 1099 for the liquidated damages portion from the Settlement Administrator. Withholdings on wages will be made in accordance with applicable law." (Settlement Agreement ¶ 9.a).  For the Net-Under Previously Paid Group and/or Non-Exempt Protected States group, the entire amount of settlement award for an individual who belongs to one or both groups "will constitute liquidated damages in connection with the FLSA Collective members' claims under the FLSA and state law. No taxes or withholdings will be deducted, and the FLSA Collective members will be solely responsible for paying all applicable taxes. The Settlement Administrator will issue to each FLSA Collective member here an IRS Form 1099." (Settlement Agreement ¶ 9.b).

---

receive $50.00 each "(which totals $1,283,650)(prior to deductions for court approved attorney's fees and costs, settlement expenses and fees, general release payment)."  (Motion, p. 11).

Next, regardless of which subgroup designation applies to a putative plaintiff, "each FLSA Collective member will be responsible for the payment of any additional local, state, or federal taxes or withholdings resulting from or attributable to the payments received." (Settlement Agreement ¶ 9.c.).

Regarding Plaintiff Smith, the parties intend a certain kind of tax treatment for her separate general release payment: it is to be treated as "non-wage penalties and liquidated damages," which will be reported on IRS Form 1099, and it will "not be subject to FICA and FUTA withholding taxes." (Settlement Agreement ¶ 11).

8.  *Releases*

The parties intend a very broad release to apply. In consideration for the settlement funds they receive, all putative plaintiffs promise to broadly release the Defendants from liability. Specifically, in consideration of the payments to be made to them, those who opt in to the Collective agree to release the Defendants from:

> all suits, actions, causes of action, claims or demands based on putative violations of the FLSA as well as putative violations of any state or local law related to or pertaining to [the Defendants'] alleged failure to accurately pay employees for all hours worked and all claims under the FLSA and any state or local law for the time period of December 1, 2021 through the date of court approval of [the] settlement, relating to or arising out of the Kronos Outage, including. . .all state, local, and federal claims for unpaid wages (whether minimum wage or overtime), failure to timely pay wages, failure to record hours worked, paystub requirements, regular rate claims, reimbursement, and all related claims for statutory damages or penalties, interest, liquidated damages, attorneys' fees, costs, expenses, and all other such amounts, and including, without limitation all claims that have been asserted in the [lawsuit] or that could have been asserted in the [lawsuit] nationwide, including. . . claims for unpaid [regular, minimum, and overtime ]wages in accordance with state, local, or federal law. . .all claims for [FLSA liquidated damages] and all claims for penalties, interest, or other damages of any kind under any other applicable state or local wage-and-hour law. . .all claims related to the calculation or payment of

14

> wages failure to timely page wages, failure to timely pay wages,
> failure to record hours worked, paystub requirements, regular rate
> claims, recoupment of overpayment, reimbursement, and all related
> claims for statutory damages or penalties arising under the FLSA
> and/or any other applicable state or local wage-and-hour law or
> common law. . .all claims for conversion, breach of contract,
> quantum meruit, unjust enrichment, theft of labor, or other common
> law or statutory cause of action related to any alleged failure to pay
> for work performed or to be performed; and all claims for interest,
> costs, and attorneys' fees.

(Settlement Agreement ¶¶ 3a, 3a.i.-3a.v.).

Separately, Plaintiff Smith also releases the Defendants from other "claims or disputes made (or that could have been made) under federal, state or local law, common law," including those related to the Age Discrimination in Employment Act and "any and all  wage-and-hour claims of any nature whatsoever."  Not encompassed in the release are "any claims that cannot be waived as a matter of express law," like the right to file an EEOC claim, although Plaintiff  agrees to waive the right to "recover any monetary damages or other relief for any claim waived by this general release should an agency pursue a claim on her behalf.  (Settlement Agreement ¶ 3c.).

> 9.  *Settlement Check: Opting In to the Collective*

Per the Agreement, settlement checks  will be mailed to every Putative FLSA Collective member. (Agreement ¶ 7d.).  Those checks will have  a release printed on  the  back  side. Specifically, the release explicitly provides:

> By cashing, depositing, transferring, or otherwise negotiating the
> enclosed check, you are agreeing to a *full and complete release of*
> *any and all wage-and-hour claims*, *including* under the [FLSA] and
> *any state/local law*, relates to the Kronos Outage that you might
> have against [Sodexo] from December 1, 2021 up until [date of court
> approval].  The wage-and-hour claims you are releasing include all
> known or unknown claims for any wage-and-hour violations,
> including by not limited to, claims related to *minimum wage*,
> overtime, wage rate, timing of payment, timekeeping, or time
> worked related to the Kronos Outage, including all related claims
> for penalties, interest, and attorneys' fees. The wage-and-hour

claims you are releasing specifically include claims that you raised or could have raised as an opt-in plaintiff in the lawsuit: [name if instant action]. The Releasees include: [list of Sodexo entities named in the lawsuit]. . .and their respective current or former parent companies, subsidiary companies, and/or. . .employee benefit program administrators, and fiduciaries.

(Exhibit C)(emphasis supplied). *See also* Settlement Agreement ¶ 3b.

In short, the parties intend that if an FLSA Putative Collective member cashes, deposits, "transfer[s]," or negotiates the check, then she is releasing her FLSA claims and any potential state or local law claims against the Defendants related to the Kronos Outage.

### 10. Attorneys: Fees and Costs

The parties intend for Plaintiff Smith's counsel to be designated as "Collective Counsel," and for the court to award them attorneys' fees and costs.  (Settlement Agreement ¶¶ 1.d, 10).

The Agreement provides that Collective Counsel anticipates requesting attorneys' fees and expenses in an amount not to exceed 33 1/3% of the Gross Settlement Amount. (Settlement Agreement ¶¶ 1.d, 10.a.).

The litigation costs are not described in the Settlement Agreement.[10]  Next, the Settlement Agreement does reflect that Plaintiff Smith will not seek an amount in excess of $5,000 as a general release payment; this amount is in addition to any individual settlement award that she may receive because she belongs to one or more of the Collective Groups.  (Settlement Agreement ¶ 11).

### 11. Reversion

Any unclaimed money left in the Qualified Settlement Fund will revert back to the Defendants, after an accounting is done.  (Settlement Agreement ¶¶ 8.e, 8.h, 8.h.iv, 8.i).

---

[10] Such expense are generally described as: $823.00 for court fees; $10,000 for mediation; $106.96 for postage; and $250.00 for legal research. (Decl. of  Matthew S. Parmet, ECF No. 34-3, p. 7).

*12. Effective Date*

The parties intend for the settlement to become effective when three conditions occur. First, that only Plaintiff Smith and Defendants have signed the Settlement Agreement.  Second, after the court approves of the settlement and of the notice.  Third, after the court approves of the attorneys' fees and costs and general release award and three business days have elapsed and no one has filed motion challenging the court's order or no one has appealed the same, and after the court resolves any motion or appeal.  (Settlement Agreement ¶¶ 6a.-6c.).

**D.  REASONS FOR RECOMMENDING DENIAL OF MOTION**

In the Motion, Plaintiff Smith urges the court to endorse the proposed one-step approval process, arguing that "the standard for approval of an FLSA settlement is lower than for a [Class Action] settlement because an FLSA settlement does not implicate the same due process concerns as does a Rule 23 settlement."  (Motion, pp. 13-14).

Having reviewed all of the submitted documents, and the relevant case law, I do not recommend that the district court grant the Motion.  As set forth below, I find that there are multiple questions that I have about the manner proposed to resolve this action, which I recommend that the parties address before any final decision is made by the district court about the propriety of the settlement.

*1.  Jurisdiction: Mootness Issue*

I find persuasive the concerns raised by the Hon. Deborah K. Chasanow related to a settlement procedure similar to the one at issue here in a case before her: *Leigh v. Bottling Grp., LLC*, Civ. No. DKC 10-0218, 2011 WL 1231161 (D. Md. Mar. 29, 2011).  In *Leigh*, the plaintiff filed an unopposed motion seeking approval of an FLSA collective action settlement.  The parties simultaneously sought: (a) approval of the settlement signed only by the named plaintiff; (b)

certification of a class of putative plaintiffs; and (c) the related approval and facilitation of notice to the potential collective members of their settlement opt-in rights. Judge Chasanow held that if she were to adopt the proposed concurrent method, then the named plaintiff's action would be resolved, rendering the rest of the case moot, as the plaintiff no longer had an interest in representing a putative opt-in plaintiff. *Leigh*, 2011 WL 1231161, at *3-4 (citing *Perez v. Avatar Properties, Inc.*, Civ. No. 07-cv-792, 2008 W 4853642, at *3 (M.D. Fla. Nov. 6, 2008)).

Put another way, a named plaintiff in a collective action only represents himself "until a similarly-situated employee opts in as a 'party plaintiff.'" *Simmons v. United Morg. & Loan Inv., LLC*, 634 F.3d 745, 758 (4th Cir. 2011) (quoting 29 U.S.C.§ 216(b)).[11]  Thus, if a named plaintiff settles his FLSA lawsuit before a putative claimant opts in to the FLSA collective, then there is no collective action for that claimant to join because the named plaintiff has no authority to settle for a putative plaintiff "who ha[d] not yet been given notice of [his] opt-in rights." *Leigh*, 2011 WL 2341161 at *4.  This raises a jurisdictional issue; it becomes a question of mootness.

It is well settled that a federal court's jurisdiction to preside over a case becomes limited or non-existent if "the issues presented [in a case] are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Simmons*, 634 F.3d at 748.  In an FLSA Collective Action context, the Supreme Court has held that if a named plaintiff resolves her individual claims before anyone joins the lawsuit, then, a court's jurisdiction to entertain the rest of the case ends because the named plaintiff's "lack[s] any personal interest in representing others in [the FLSA collective] action." *Genesis Health Care Corp. v. Symczyk*, 569 U.S. 66, 73 (2013).  *See also Cameron-Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003)(named plaintiff who settled her lawsuit rendered moot collective action).

---

[11] This requirement is dissimilar to " a class action filed pursuant to Federal Rule of Civil Procedure 23 or comparable state court rule." *Simmons*, 634 F.3d  at 758.

The Motion does not address this mootness issue.  Instead, the Motion focuses on due process concerns.  According to Plaintiff Smith, if a putative FLSA Collective member fails to opt in to the instant action, nothing would preclude that person from bringing her own lawsuit in the future.  (Motion, p. 14).  Plaintiff Smith relies upon the following caselaw to support her argument: *Diaz v. Scores Holding Co., Inc.*, Civ. No. 07-CIV-8718, 2011 WL 6399468, at *2 (S.D.N.Y. Jul. 11, 2011); *Osman v. Grube, Inc.*, Civ No. 3:16-cv-802, 2018 WL 2095172, at *2 (N.D. Ohio May 4, 2018); and *Risbook v. Blue Horseshoe Network, LLC*, Civ. No. 19-11262, 2020 WL 13441574, at *3 (E.D. Mich. Sept. 4, 2020).  My review of *Osman* leads me to find that there was no mention of the mootness.  My review of *Risbook* revealed that that court cited to *Osman*, but similarly, there was no discussion of the mootness issue.  And, my review of the docket in *Risbook* revealed that there were 44 opt-in plaintiffs (including the named plaintiff), who had submitted their forms to the court.  My review of *Diaz* led me to the same result: no discussion of the jurisdiction issue.

Relying principally upon *Leigh* and *Symczyk*,  then, I find that if the court approves of the Settlement Agreement it would moot all of Plaintiff Smith's personal interests in the action and divest her of the authority to settle this case on behalf of others who have not yet opted in.  I further find that, to date, only eight additional plaintiffs have opted-in to the FLSA Collective Action.  Thus, at this juncture, Plaintiff Smith can only represent the interests of those other people.  *See also  Cerrato v. Alliance Material Handling, Inc.*, Civ. No. WDQ 13-2774, 2014 WL 1779823, at *1 (D. Md. Apr. 30, 2014)(adopting  the rationale of *Leigh* and declining to approve of settlement procedure).[12]

I further find that asking the court to certify the Collective Groups "for settlement only" does not cure the jurisdictional issue.  In this District, "[c]ertification, in the FLSA context, is

---

[12]In *Cerrato*, the Hon. William D. Quarles (ret.) relies upon Judge Chasanow's opinion in *Leigh* and also relies upon *Cameron-Grant*.  2014 WL 1779823 at *2.

merely the trial court's exercise of discretionary power to notify potential class members." *Blake v. Broadway Servs, Inc.*, Civ. No. CCB 18-086, 2018 WL 4374915, at *2 (D .Md. Sept. 13, 2018)(quoting *Hoffman-LaRoche Inc. v. Sperling,* 493 U.S. 165, 169 (1989)).  However, I find that mailing notices to putative collective plaintiffs  does not "produce a class with independent legal status." *Symczyk*, 569 U.S. at 73. Put another way, even if the court were to grant conditional certification, that will not confer upon Plaintiff Smith a legal interest in the FLSA lawsuit where her claim has been resolved before more putative plaintiffs have opted in. *See Parra v. Quality Controlled Concrete, LLC*, Civ. No. 13-cv-1113, 2015 WL 12750445, at * (M.D.N.C. Mar. 11, 2015)(court does not retain jurisdiction in an FLSA collective action case to enforce a settlement agreement where potential plaintiffs are not given a chance to opt in before named plaintiff's case is dismissed).  In short, the district court would still lack jurisdiction.

Relatedly, the Motion asks the court to "dismiss all claims asserted in this action with prejudice" upon approval of the settlement agreement.  (ECF Nos. 34, p. 2; 34-1, pp. 7, 34).  The Settlement Agreement says that the parties stipulate to the certification of the Collective by the court "for settlement purposes only."  (Settlement Agreement ¶ 5a.i).  The parties also intend for the court to have continuing jurisdiction to "construe, interpret and enforce the provisions of this Agreement and to supervise the administration and distribution of the resulting settlement funds." (Settlement Agreement ¶ 26).  However, the parties do not explain how, if the district court approves of the settlement agreement and dismisses the case, there remains a legal action for the putative plaintiffs to join. *See Coleman v. Amazon.Com, Inc., et al.*, Civ. No. 21-cv-2200, 2023 WL4408713, at *3 (W.D. Tenn. Jul. 7, 2023).

In sum, I do not recommend that the court grant the request for simultaneous approval of the settlement, collective certification to facilitate notice to thousands of putative plaintiffs, and

dismissal of this case before all putative plaintiffs have been given the right to opt in.

### 2. Options for the Parties

The *Leigh* court, when faced with a settlement procedure similar to the one in the instant case, identified four options available to the parties:

> Option #1: The parties could rely upon the settlement agreement but seek approval only as to the named plaintiff;

> Option #2: "abandon the settlement and continue to litigate the merits as to the named [p]laintiff only;"

> Option #3: abandon the settlement agreement submitted to the court "and proceed collectively, as a contested collective action;"

> Option #4: ask the court to review the submitted settlement agreement, and notice of settlement related thereto, and to make a conditional certification decision, as well as determine whether the notice is appropriate. If the court approves of the notice as a sufficient way to notify putative plaintiffs of their opt-in rights, the notice can be mailed to those plaintiffs and the parties can later seek court approval of a settlement agreement that putative plaintiffs have joined. The parties would then later seek court approval of a revised settlement agreement, consistent with the court's dictates.

*Leigh*, *supra*, at *3-4 (quoting *Perez*, 2008 WL 4853642, at *2).

Accordingly, because I find the *Leigh* court's analysis persuasive, I also find that the parties have a decision to make about what they want to do now. I recommend that the district court order them to review the caselaw cited herein and to elect how they want to proceed within 30 days of the issuance of an order denying the Motion.

Assuming that the parties choose Option #4, I have identified several issues that need to be addressed in writing, and likely at a hearing, should the district court deem it required.

### 3. Certification of Collective

Because Plaintiff Smith seeks approval of a settlement agreement  that purports to resolve a FLSA collective action claim asserted on behalf of a collective action group who has not yet

been certified, the reviewing court must certify the putative collective before addressing the terms of the settlement. *Leigh*, *supra*, 2011 WL 1231161, at *4.

In this District, in general, the collective action certification process involves two phases. *See e.g., Lancaster v. FQSR,* Civ. No. TDC 19-2632, 2020 WL 5500227, at *2 (D. Md. Sept. 11, 2020); *Butler v. DirectSAT USA,* LLC, 876 F. Supp. 2d 560, 566 (D. Md. 2012); *Syrja v. Westat, Inc.*, 756 F.Supp. 2d 682, 686 (D. Md. 2010); *Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000); a*ccord, Leigh*, *supra*, at *4.

During the first phase, which typically is initiated before discovery, a court decides whether the named plaintiff has sufficiently established that other putative plaintiffs are similarly situated to her such that the group may be conditionally certified. *Camper*, 200 F.R.D. at 519. This initial court review is done so that a court-facilitated notice may be sent to the similarly-situated putative collective members, telling them that they can join the litigation. *Butler*, *supra*, 876 F. Supp. 2d at 566. During the first phase, to be considered "similarly situated," a group of potential FLSA plaintiffs must "demonstrate that they were victims of a common policy, scheme, or plan that violated the law." *Butler*, 876 F. Supp. 2d at 566. The burden or factual showing to demonstrate that a group of potential plaintiffs is similarly situated is often described as relatively low. *See, e.g., Butler*, at 566; *Lancaster, supra*, at *2-3.

During the second phase, after putative class members have had the opportunity to opt in or object to the settlement, a court decides whether final certification of the collective group is appropriate, as well as whether the settlement presents a fair and reasonable compromise of a *bona fide* dispute between the parties, as required under the FLSA. *Leigh, supra*, at *4 (*citing Su v. Elec. Arts Inc.,* Civ. No. 05-cv-131, 2006 WL 4792780 (M.D. Fla. Aug. 29, 2006)); *cf. Lynn's Food Stores, Inc. v. United States,* 679 F.2d. 1350, 1354 (11th Cir. 1982). Thus, during the second

phase, even in a settlement agreement context, a court engages in a "more stringent inquiry" to ascertain "whether plaintiffs are, in fact, 'similarly situated,' as required by [29 U.S.C. § 216(b)]." *Edelen v. American Residential Services, LLC, et al.*, Civ. No. DKC 11-2744, 2013 WL 3816986, at *4 (D. Md. Jul. 22, 2013)(quoting *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007)).  Put another way, despite the fact that parties agree to resolve FLSA claims via a collective action, "'some final class certification' [determination] must be made before approving a collective action settlement."  *Edelen*, 2013 WL 3816986, at *4 (quoting *Carter v. Anderson Merchs., LP*, Civ. Nos. 08-cv-25, 09-cv-216, 2010 WL 144067, at *3)(further citation omitted)(internal quotation marks omitted)).

Factors that a court considers when determining whether final collective certification is appropriate include:

> (1) the disparate factual and employment settings of the individual plaintiffs;
> (2) the various defenses available to [Defendants] which appear to be individual to each plaintiff; and
> (3) fairness and procedural considerations.

*Edelen*, *supra* (quoting *Rawls*, 244 F.R.D. at 300)(internal quotation marks omitted).

In the Motion, Plaintiff Smith asks the court to approve of the Settlement Agreement, including of the notice to be sent to the putative plaintiffs.  However, the Notice of Settlement does not specify to whom the notice should be sent (e.g., all current or former employees of the three Sodexo entities who were impacted by a cyberattack to a payroll system called Kronos).  I recommend that the parties be ordered to amend the Notice of Settlement to provide such information.

Assuming that this minor defect can be corrected, the Settlement Agreement applies to all non-exempt Sodexo employees impacted by the Kronos Outage, regardless of their job title or

actual position held, as long as they were employed by any of the Sodexo entities and fall within any of three FLSA Collective Groups identified.  According to Plaintiff Smith, the Defendants failed to properly and timely pay their employees due to the impact that the Kronos Outage had on their payroll system during the period of December 6, 2021 - March 21, 2022.  I find that these putative plaintiffs were subject to a common policy, scheme, or plan that may have violated the law.  *Butler*, 876 F. Supp. 2d at 566.  Thus, I find that Plaintiff Smith has made the threshold showing that she and other putative plaintiffs are similarly situated enough to warrant conditional certification as an FLSA collective.  I recommend that the district court so find and facilitate the mailing of notice to putative plaintiffs.

However, I do not recommend that the district court find that Plaintiff Smith has met her burden that she and the putative members of the Collective Groups are similarly situated under the more stringent **final** certification standard required by *Edelen*.  In the Complaint, Plaintiff Smith generally asserts that she was  a non-exempt hourly employee of Sodexo," for whom she has worked since March 2021.  The Complaint does not identify Plaintiff Smith's job title, nor does it clearly identify which of the three Sodexo entities for which she worked, nor the state in which she worked.  (*See, e.g.,* Complaint ¶¶ 4, 10, 14-16, 65-67, 77-83, 93, 94, 96).  Relatedly, the Complaint does not specify her dates of employment; it merely states that she was "at all relevant times an employee of Sodexo."  (Complaint ¶ 15).  The Complaint also alleges that Plaintiff Smith is similarly-situated to all current or former non-exempt employees who worked for any of the three Sodexo entities anywhere "in the United States at any time since the onset of the Kronos ransomware attack, on or about December 11, 2021, to the present," who also seek to recover "unpaid overtime wages and other damages owed. . .to them."  (Complaint ¶¶ 10, 11, 17).  These workers are identified as "Similarly-Situated Workers" or "the FLSA Collective."  (Complaint ¶¶

17-18).   Regarding the Similarly Situated Workers, the Complaint states that they were non-exempt hourly and salaried employees, some of whom may have been managers; i.e, they were not just hourly employees, like Smith.  (Complaint ¶¶ 56, 74, 85).  The Complaint also implies that, in addition to different pay rates, Plaintiff Smith and the other affected workers might have different job titles, job duties, and hail from different states,[13] yet Plaintiff Smith is nonetheless "similarly situated" to the others because they are all "non-exempt workers" entitled to overtime pay.  (Complaint ¶¶  2, 3, 17, 68, 98-101).

The Motion principally addresses the reasonableness of the settlement as a general matter and why attorneys' fees sought are appropriate.  Yet, the Motion does not address any issues relate to final certification of the Collective.  Based on the documents submitted to date, I cannot determine whether there are disparate factual and employment settings that are material to deciding whether Plaintiff Smith and the putative plaintiffs are similarly situated.  Nor can I determine whether the Settlement Agreement is fair.  *See Edelen, supra*. Accordingly, without more, I do not recommend that the district court approve of the settlement agreement and enter an order dismissing the case with prejudice.

If  the parties select Option #4, I recommend additional briefing, and possibly a hearing, should the district court deem it appropriate, to address the issues identified herein.

   *4.   Opt In and Scope of Release*

Pursuant to 29 U.S.C. § 216(b):

> No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Written consent means that a potential plaintiff opts in to the FLSA collective action by

---

[13] The Collective Action complaint does not identify any states by name.

providing affirmative notice to the court of her intention to be a party to the action. *Simmons*, 634 F.3d at 758. Typically, that written consent "is filed in the court in which the action is brought." *Simmons*, 634 F.3d at 758. *See also Symczyk*, *supra*, 569 U.S. at 75 (a plaintiff opts in to a collective action only by filing written consent with the court); *Sandoz v. Cingular Wireless, LLC*, 553 F.3d 913, 919 (5th Cir. 2008).

Plaintiff Smith seeks court approval of a procedure that provides that if a putative collective action member cashes or otherwise negotiates his settlement check, then that constitutes sufficient written notice as required by the FLSA. However, the Motion does not address how that proposed procedure constitutes proper written consent by the putative plaintiffs, as required by *Simmons* and *Symczyk*. Indeed, Plaintiff Smith has not cited to any case law in support of her argument that cashing a check constitutes proper written consent **filed with the court**.

In addition, eight additional plaintiffs have opted in to the FLSA Collective by notifying the court using the same form that Plaintiff Smith executed. *See* ECF Nos. 3, 8, 11, 17, 18, 25. It is unclear why such a form, with modifications, cannot be distributed to putative plaintiffs. Moreover, it is worth noting that the Settlement Agreement does not require the Administrator to notify the court of the identities of the individuals who opt in to the Collective; only notice to the Collective Counsel and Defendants' counsel of the names of the parties who have negotiated their settlement checks is required. (Settlement Agreement ¶ 8h.i). *Cf. Simmons v. United Mort. Loan Inv., LLC*, 634 F.3d 745, 758 (4th Cir. 2011).

Furthermore, the undersigned has found two recent cases where the courts have surveyed the legal landscape on this topic and have collected cases from multiple districts: *Payton-Fernandez v. Burlington Stores*, ___ F.Supp. 3d ___, 2023 WL 3145140, at *6-7 (D. N.J. 2023) and *Coleman, supra*, 2023 WL4408713, at *2-3. In general, these courts have found that

negotiating or cashing a settlement check does not satisfy the "plain language" requirement of the FLSA that written consent be filed with the court to opt in to an FLSA Collective.  (*Id.*).[14]

Next, given the differences between the three putative Collective Groups, declining now to finally approve of the settlement provides putative plaintiffs an opportunity to make an intelligent choice: opt in by executing a written form or submit written objections to the settlement. *Leigh*, *supra*, at *4-5.  I further recommend that the  forms or written objections be submitted to Collective Counsel, who can reference them in any motion later submitted seeking final certification of the Collective.

Relatedly, as currently drafted, the notice of settlement and the check release do not sufficiently make putative plaintiffs aware of their legal rights and the claims that they are asked to give up.[15]  *See* Section III.A.6 below.

To be clear, the undersigning is not finding that cashing or negotiating a check should always be presumed to be an insufficient form of written consent to opt in to an FLSA collective, nor am I finding that notice on the back of a check is presumptively invalid.  For instance, if a court has already conditionally certified an FLSA Collective and approved of the notice, the putative plaintiffs are notified that they do not give up all rights if they fail to cash/negotiate a check and are given an opportunity to object in writing, and the court conducts a fairness hearing and then performs a final collective certification analysis. *See Edelen, supra.*

In sum, I do not recommend that the district court approve of the settlement agreement at this juncture until putative plaintiffs are given an opportunity to affirmatively opt in or object to

---

[14] *See also Inman v. Tap Btown, Inc.*, Civ. No. 22-cv-1639, 2023 WL 2529340, at *2 (S.D.Ind. Feb. 17, 2023).

[15] The Complaint does not assert violations of any state or local laws, just a single FLSA overtime violation claim. It does not adequately plead failure to pay minimum wage. However,  the Settlement Agreement asks all potential plaintiffs to release the Defendants from all FLSA claims, as well as forego their rights to advance any claims predicated upon violations of state or federal law, including related to regular, minimum and overtime wages.  This is especially true for the largest of the three putative Collective Groups, which reportedly is a group of more than 25,000 people who worked in one of 14 different states. (Settlement Agreement, p.2; ¶¶ 3.a., 3.a.i.).

the settlement. If the parties select Option #4, I recommend additional briefing to address the issues identified herein.

### 5. *Formulas for Computing Awards*

According to the Motion, the $3,100,000 available to pay members of the Collective Groups is generally allocated as follows: (a) "Net-Under Collective Group" will receive "100% of the wages remaining unpaid ($288,011) and 80% of alleged liquidated damages (prior to deductions for court approved attorney's fees and costs, settlement expenses and fees, general release payment);" (b) the "Net-Under Previously Paid Collective Group" will receive "74% of the alleged underpayment of $1,749,948 as liquidated damages. . .which totals $1,297,931 (prior to deductions for court approved attorney's fees and costs, settlement expenses and fees, general release payment);" and (c) "Non-Exempt Protected States Collective Group: each of the 25,673 employees that constitute this group will receive $50.00 each "(which totals $1,283,650)( prior to deductions for court approved attorney's fees and costs, settlement expenses and fees, general release payment)." (Motion, p. 11).

The Agreement proposes an involved method for determining the true amount of monies actually available for distribution to the members of the Collective Groups.  First, the parties intend for the Gross Settlement Amount to be used to make payments: (a) separately to Plaintiff Smith, an additional "general release" payment; (b) of the costs and fees incurred by a Settlement Administrator for administering the fund; and (c) of the attorneys' fees and costs of  Collective Counsel.  (Settlement Agreement ¶¶ 1.d, 1.g, 1.h, 10, 11).

Assuming that the parties select Option #4, I find that the formulas to be used by the Administrator to compute each putative plaintiff's settlement award require greater explanation. The formulas are:

1. For the "Net-Under" group: an estimated amount of $518,419 from the Gross Settlement Fund, to be allocated on a pro-rata share of their underpaid amount as compared to the total amount of the "Net-Under" Putative FLSA Collective members' aggregate amount. The actual amounts distributed will be determined by the portion of the Collective Settlement Amount allocated to the "Net-Under" group as described herein. For example, if a Putative FLSA Collective member's personal underpayment amount was 0.1% of the total "Net-Under" Putative FLSA Collective members' aggregate underpayment amount, then that claimant shall receive 0.1% of the portion of the Collective Settlement Amount allocated to the "Net-Under" group, as described herein. However, "Net-Under" Putative FLSA Collective members shall each receive a minimum of $30.00 from the net settlement amount if their pro rata share results in a potential payment of less than $30.00. This may require the Settlement Administrator to recalculate the pro rata shares. In no way will this result in an increase of the Gross Settlement Amount.

2. For the "Net-Under Previously Paid" group: an estimated amount of $1,297,931 from the Gross Settlement Fund, to be allocated on a pro-rata share of their allegedly late paid amount as compared to the total amount of the "Net-Under Previously Paid" Putative FLSA Collective members' aggregate amount. The actual amounts distributed will be determined by the portion of the Collective Settlement Amount allocated to the "Net-Under Previously Paid" group as described herein. For example, if a Putative FLSA Collective member's personal late paid amount was 0.1% of the total "Net-Under Previously Paid" Putative FLSA Collective members' aggregate underpayment amount, then that claimant shall receive 0.1% of the portion of the Collective Settlement Amount allocated to the "Net-Under Previously Paid" group, as described herein. However, "Net-Under Previously Paid" Putative FLSA Collective members shall each receive a minimum of $30.00 from the net settlement amount if their pro rata share results in a potential payment of less than $30.00. This may require the Settlement Administrator to recalculate the pro rata shares. In no way will this result in an increase of the Gross Settlement Amount.

3. For the "Non-Exempt Protected States" group: an estimated amount from the Gross Settlement Fund of $1,283,650, to be allocated on a per (sic) rata person basis. The actual amounts distributed will be determined by the portion of the Collective Settlement Amount allocated to the "Non-Exempt Protected

States" group as described herein. In no way will this result in
an increase of the Gross Settlement Amount.

(Formula ¶¶ 1-3).

As a preliminary matter, the Agreement does not identify which subgroup's settlement award should be calculated first by the Administrator. I am not entirely sure that the sequencing matters, but it might.

Next, paragraphs 1c.i. through 1c.iii of the Settlement Agreement make clear that a putative plaintiff could belong to more than one group.  Thus, by way of example, at this juncture, is it unclear how many putative collective plaintiffs are just part of the Net-Under group, or how many of them fall within the Net Under group and the Non-Exempt Protected States group.  Thus, by way of example, it is not clear how the Administrator is to compute pro rata shares for those who belong to the Net-Under and Net-Under Previously Paid groups. Further clarification is required.

In addition, for the Net-Under group, the parties intend for approximately $518,419 to be available for awards, **minus** attorneys' fees/costs, **"settlement expenses and fees,"[16]** and a general release payment to Smith ("the deductions").  (Motion, p. 11; Settlement Agreement, Exhibit B, p. 21, ¶ 1)(emphasis supplied).  Thus, as I understand it, only after the deductions are taken do the parties intend for the remaining money to be used to pay settlement awards to this subgroup.  I will call this "Truer Net-Under figure."  However, this Truer Net-Under figure is imprecise; i.e., neither the Agreement nor Attachment B clearly articulate what the Truer Net-Under figure will be (how much of the $518,419 figure will be available after the deductions).  This is because the parties do not know how many plaintiffs will join the FLSA Collective.  This is also because the parties never make clear how much of the attorneys' fees and costs, the Administrator's costs, and

---

[16] Although this term is not defined in the Motion, I assume that the parties actually mean the Administrator's costs incurred, because this is what the Settlement Agreement says. (Settlement Agreement, p. 3).

the general release payment  will be deducted from the "Net-Under" funds, rather than from the Net-Under Previously paid and/or the "Non-Exempt Protected States" tranches of money.  And, it is not clear whether that the Administrator's fees will be deducted  from the Net-Under, Net-Under Previously Paid, or Non-Exempt States pool of money, or equally from all three.

Continuing with the "Net-Under" subgroup, the parties appear to want the next step to be that the Administrator bear in mind the $518,419 and the amount that each of the 2,632 putative plaintiffs was underpaid, so that the Administrator can determine, on a pro rata basis, how much each putative plaintiff will receive.  The parties also intend that if the Administrator's pro rata computations  would result in a [putative] Net-Under member receiving less than $30.00, then that member shall receive a minimum of $30.00.  (*Id*.).

The parties state that the Administrator may need to "recalculate the pro rata shares," but they do not describe what such recalculation would entail.  (*Id*.) .

In sum, although an estimated $518,419 is ostensibly available for distribution to the 2,632 members of the Net-Under group, the true potential award for each putative plaintiff  is unclear because of the unknown variables (e.g., total number of group members, amount of Administrator's fees, amount of attorneys' and costs to be taken from this pool of money).

For the Net-Under Previously Paid group, the parties intend for $1,297,931 to be available for payment. However, the same concerns apply for the Net- Under Previously Paid group.  Given all of these unknown variables, I do not understand how it is possible to determine whether members of these two subgroups will receive minimum distribution amounts of $30.00.

Regarding the Non-Exempt Protected States group, the parties intend for approximately $1,283,650 to be available for award payments, again **minus the deductions**.  (Motion, p. 11; Settlement Agreement, Exhibit B, ¶ 3). The formula for this group does not contain a lot of detail.

The parties merely state that the money should be allocated on a "per(sic) rata person basis." There is no hypothetical given, nor is a minimum payment amount contemplated.[17]  Thus, I have even more concerns about this distribution formula.

The Collective Settlement Amount will also be used to account for each FLSA Collective member's share of "applicable federal, state, and local taxes required to be withheld by Sodexo." (Settlement Agreement ¶ 1.g).  It is not explicitly stated, so I presume that these tax deductions will be taken after the final settlement amount is determined for each member of the Collective. This could be an incorrect assumption.

Each Collective member is responsible for paying "any additional local, state, or federal taxes or withholdings resulting from or attributable to the payments received." (Settlement Agreement ¶ 9.c).  And, the withholdings and taxes are to be deducted before the Collective Settlement Amount number can be truly known.

In sum, I do not recommend that the district court approve of the settlement agreement until there is more certainty about the true amount of money available for distribution to the putative plaintiffs.

If the parties select Option #4, I recommend additional briefing to address the issues identified herein.

### 6.  Notice of Settlement

Even though I find that the district court could conditionally certified the proposed FLSA Collective, the undersigned has several questions about the proposed Notice of Settlement, which preclude me from recommending approval.  The concerns include minor issues and more material issues.

---

[17] The Motion states that each member of this group will receive $50.00. (Motion, p. 11).

One of the undersigned's concerns about the procedure proposed relates to the scope of the release contemplated here, the notice on the back of the check, and the notice of settlement.

It appears as though **all** putative collective members-- regardless of the Collective Group(s) to which they belong-- promise to broadly release the Defendants from liability for actual and possible causes of actions.   (Settlement Agreement ¶ 3a).   However, it is not clear that the consideration given in exchange for such a broad release is the same for all members of all of the FLSA Collective Groups.   For example, *certain* members of *only one* of the Collective Groups already received  an  overpayment "up to" the amount of $8,000,000.   (Motion, pp. 8, 9, 12).[18] The parties intend that these subgroups' members who opt-in to the settlement will  not be asked to repay the Defendants any of this amount.   (*Id.*).[19]   Without an explanation from Plaintiff Smith, this could be construed a significant thing of value being given to only a limited universe of putative plaintiffs, yet it is not clear why this benefit has been conferred.   A putative plaintiff needs to be able to receive adequate notice to be able to intelligently assess the fairness of the settlement and to decide whether to join the settlement or reject it.   *See generally Graham v. Famous Dave's of America, Inc.*, Civ. No. DKC 19-0486, 2022 WL 1081948, at *5 (D. Md. Apr. 11, 2022).

If the parties chose Option #4, I recommend that the parties consider the issues raised herein and provide additional briefing on the same.   It might be prudent to further explain or eliminate some of the provisions currently in the Notice of Settlement.

---

[18] Specifically, *only* three subgroups of the Net Under Previously Paid Collective Group  received the overpayment. The Defendants paid only these select members of the Net Under Previously Paid Collective Group because of "California's more exacting wage-and-hour laws to ensure no underpayment or late payment occurred," and for the Sodexo Universities' employees, they were paid "despite the fact that many employees did not work much of the Kronos outage period [because] it was the traditional winter break." Specifically, the CA employees(seemingly regardless of which Sodexo entity employed them); Sodexo's "Universities" employees; and an undefined number of "many" employees who were paid "full wages in(sic) weeks they were not scheduled to work, or were scheduled to work less hours because of the upcoming holidays." (Motion, pp. 8-11).  Neither the Settlement Agreement nor the Notice of Settlement clearly explains that only certain members of one of the Collective Groups received an overpayment in the amount of $8,000,000.  (Settlement Agreement, ¶).
[19] Neither the Motion nor the Agreement ever identifies how many members received the overpayment.

I am relying principally on *Leigh* and the caselaw cited therein, especially *Su v. Electronic Arts, Inc.*, Civ. No. 05-cv-131, 2006 WL 4792780 (M.D. Fla. Aug. 29, 2006).

First, the Notice of Settlement ("Notice") does not specify to whom the notice should be sent (e.g., all current or former employees of the three Sodexo entities who were impacted by a cyberattack to a payroll system called Kronos). I recommend that the parties be ordered to amend the Notice of Settlement to provide such information.

Second, there is no Administrator identified so that parties do not know who to contact.

Third, the notice does not mention that Plaintiff Smith is to receive a general release payment not to exceed $5,000. If this is an incentive award, then the Notice needs to explicitly state that, and why she is receiving this service award. And, there is no explanation that Plaintiff Smith could receive this award in addition to an award due to membership in one of the Collective Groups. Next, the Notice mentions that putative plaintiffs are bound by an attorney-client agreement that Plaintiff Smith signed, but there is no explanation of what this means.

Fourth, the Notice needs to make clearer that the following deductions will be taken from the settlement fund **before** award amounts for individual plaintiffs are determined: (a) Administrator's costs; (b) attorneys' fees and costs; (c) general release payment to Plaintiff Smith; and (d) each Collective member's share of applicable federal, state, and local taxes required to be withheld by the Sodexo entities. As a preliminary matter, the notice does not identify the proposed amounts of: the Administrator's fees and costs, the attorneys' fees and costs, or the amount of Plaintiff Smith's release payment. Next, the Notice does not explain that a putative plaintiff could receive less than the $30.00 promised if, e.g., there are more plaintiffs who opt in, the Administrator's costs and fees are a certain amount, or if the state and local taxes to be withheld equal a certain amount. It is not necessarily accurate to say that a plaintiff will receive a $30.00

minimum award.  In short, there needs to be a clearer explanation that the deductions could impact whether a putative plaintiff does, in fact, receive a $30.00 or $50.00 minimum award.

Fifth, the Notice needs to briefly address how a determination is made that a putative plaintiff could belong to more than one group.  Providing greater recovery to a putative plaintiff who belongs to two groups, by itself, is not necessarily problematic.  However, membership in more than one group will necessarily impact the award that each putative class member ultimately receives.  The Notice of Settlement does not address these differences.

Sixth, there needs to a better description of the tax treatment (IRS Form 1099 vs. IRS Form W-2) of the settlement awards.

Seventh, the Notice needs to mention that any unclaimed money reverts back to the Defendants.

Eighth, the Notice needs to adequately describe the procedural posture of this case.  Specifically, the Notice needs to notify putative plaintiffs that the court has only conditionally certified the FLSA Collective to facilitate notice to them, but the court will later make a final determination about final certification of the Collective after reviewing written consent forms, written objections, and after a hearing is conducted.

Ninth, the Notice needs to mention that the putative plaintiff not only has a right to join the Collective, but also has the right to object in writing. If the putative plaintiff does not object in a manner identified in the Notice, then she will be deemed to have approved of the Settlement Agreement.

In sum, the Notice of Settlement, as currently drafted is inadequate.  If the parties select Option #4, I recommend additional briefing to address the issues identified herein and submission of a revised notice for court approval.

*7. Settlement Administrator*

I recommend that the district court order the use of an Administrator to manage the fund. However, as stated above, the parties need to identify that person/entity and provide information about the Administrator's fees and costs.  Next, as stated previously, I find that the Agreement does not contain an estimate of the fees and costs for the Administrator to perform his/her administrative duties.

*8. Plaintiff Smith as Collective Representative*

I further find that the Motion and Agreement fail to provide sufficient information on Plaintiff Smith to evaluate whether she is also entitled to the general release payment.

Although not explicitly stated, the inference is Plaintiff Smith would receive this additional payment were the court to designate her as Collective Representative.  (Settlement Agreement ¶ 5a.iii).  So, it is not clear whether this is actually a service award rather than a "general release payment."

 If it is actually a service award, why not name it as such?  Next, it is not clear why Plaintiff Smith should receive an incentive award and not the eight other people who executed the same consent form that she did.  There is no affidavit or a declaration that tells the undersigned what efforts has she has undertaken in this litigation: Did she attend the settlement conference? What actions did she take to protect the interests of putative collective members? Without knowing this, I cannot recommend that the district court find it reasonable that she seek payment of a service award and that she do so in an amount of $5,000 or less.

It is worth nothing that the Motion does not mention which Collective Group(s) pertain to Plaintiff Smith.  Thus, as stated previously, I have no idea how she is truly representative of the Collective;  how she is similarly situated.

If the parties select Option #4, I recommend additional briefing to address the issues identified herein.

9. *Attorneys' Fees and Costs*

The litigation costs are generally described as: $823.00 for court fees; $10,000 for mediation; $106.96 for postage; and $250.00 for legal research.  (Decl. of  Matthew S. Parmet, ECF No. 34-3, p. 7).

The Agreement provides that  Collective Counsel anticipates requesting attorneys' fees and expenses in an amount not to exceed 33 1/3% of the Gross Settlement Amount. (Settlement Agreement ¶¶ 1.d, 10.a.).   The Motion  specifically articulates that Collective Counsel seeks $1,033,333 for attorney's fees, and $11,179.96 for costs, including $10,000 for "mediation."  (The Motion, pp. 25, 33).  The Notice of Settlement is silent on the amount of attorneys' fees and costs.

The Motion specifically articulates that the  $1,033,333 for attorneys' fees is computed per the "percentage-of-the-fund" approach.  (Motion, pp. 23-25).  According to Collective Counsel, their fee represents "9.3% of the "total value of the settlement proposed here.'" (Motion, p. 25).  Collective Counsel can represent that this amount is "9.3% of the "total value of the settlement proposed here,"" only by including the $8,000,000 in "forgiven overpayments."  This method raises questions, given  the fact that only one subgroup is set to receive the benefit of the overpayment being forgiven (Net-Under Previously Paid group),  and that subgroup is smaller than a subgroup whose members are from states with more exacting wage-and-hour laws and who never received any money.  In addition, Plaintiff Smith asserts that the district court use "percentage-of-the fund approach" for calculating attorneys' fees.  (Motion, pp. 23-25).

I find the parties have provided me with insufficient information to be able to determine whether the proposed attorneys' fees are reasonable.  If the parties select, Option #4,  I recommend

that the district court find that "without knowing the size of the [FLSA Collective]- or whether there will even be a class-any request for approval at this juncture is premature." *Leigh,* 2011 WL 1231161 at *5.  Accordingly, I further recommend that the district court order the parties to provide additional briefing related to the attorneys' fees and costs submitted, in light of the issues raised in this Report and Recommendations.  Should it be appropriate, the district court can notify the parties whether it will address the attorneys' fees and costs at a hearing, including whether Collective Counsel has met its burden on reasonableness of the fees.  *See generally Lyle v. Food Lion, Inc.*, 954 F.2d 984, 988 (4th Cir. 1992); *Randolph v. Powercomm Construction, Inc.*, No. 16-3270, 2017 WL 5032476, at **1, 2 (4th Cir. Oct. 31, 2017).

*10. Hearing*

Assuming that the parties select Option #4 and submit an amended settlement agreement and exhibits in support thereto, as stated previously, I recommend that further briefing is required related to the issues identified in this Report and Recommendations.  I also recommend a fairness hearing so that the district court can evaluate the adequacy, reasonableness and fairness of the revised settlement agreement submitted.

## III.   CONCLUSION

In sum, for the foregoing reasons, I respectfully recommend that the district court deny the Motion without prejudice.  I further recommend that the parties notify the district court within 30 days of the issuance of its order denying the Motion whether they are selecting Option #1, 2, 3 or 4.  Finally, I respectfully recommend that, if necessary, the district court order additional briefing and a hearing, as set forth herein.

Dated: February 6, 2024                        _____/s/_____
                                               The Honorable Gina L. Simms
                                               United States Magistrate Judge